UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 1:17-cr-10267-IT |
| | * | |
| GEOVANE JOSE FERREIRA, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER

February 1, 2019

TALWANI, D.J.

In 2003, the United States Customs and Border Protection detained Defendant Geovane Jose Ferreira, a Brazilian citizen, as he attempted to enter the United States. Ferreira was removed to Brazil two weeks later pursuant to an expedited order of removal. Ferreira returned to the United States without permission the following year and has lived in the Greater Boston area since then. In August 2017, after he was detained by Immigration and Customs Enforcement ("ICE"), Ferreira requested a "credible fear" interview. A few weeks later, before the interview was held, Ferreira was indicted on one count of unlawful re-entry of a deported alien pursuant to 8 U.S.C. § 1326.[1] Ferreira filed the pending Motion to Dismiss [#34] the Indictment, arguing that the 2003 deportation upon which the Indictment relies violated due process and cannot be used to establish a violation of 8 U.S.C. § 1326(a).

After a two-day evidentiary hearing, the court finds that Ferreira is entitled to consideration of his collateral attack on the 2003 deportation order and has shown that certain

---

[1] 8 U.S.C. § 1326(a) states that any alien who "has been denied admission, excluded, deported, or removed or has departed the United States while an order of deportation, exclusion, or removal is outstanding, and thereafter [] enters, attempts to enter, or is at any time found in the United States . . . shall be fined under Title 18, or imprisoned not more than 2 years, or both."

procedural errors occurred during his removal. Ferreira is not entitled to dismissal of the Indictment, however, as he has failed to meet his burden of showing prejudice from those procedural errors. Ferreira's motion is therefore DENIED.

A. Factual Background

The court finds the following facts based on the testimony and documents presented at the evidentiary hearing.

1. Ferreira's 2003 Entry into the United States and Fear of Returning to Brazil

In 2003, Ferreira tried to enter the United States through the San Ysidro, California, port of entry by hiding with others in the trunk of a Ford Explorer. The vehicle was stopped and its occupants -- two men and one woman from Mexico, and three men from Brazil – were detained. Hr'g Ex. 6. All six were turned over to other immigration officials for expedited removal. Id.; see 8 U.S.C. § 1225(b)(1)(A)(i). At the time, Ferreira was twenty-one years old and spoke only Brazilian Portuguese.

Ferreira did not request a credible fear interview[2] and did not ask to withdraw his application for admission[3] to the United States. Ferreira now states that had he been asked if he

---

[2] Pursuant to 8 U.S.C. § 1158 as it appeared in 2003 (the year in which Ferreira was deported), "[t]he Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Attorney General under this section if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." To be deemed a refugee, Ferreira must show that he experienced "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (effective Oct 1, 2003).

[3] "An alien present in the United States who has not been admitted or who arrives in the United States shall be deemed . . . an applicant for admission." 8 U.S.C. § 1225(a)(1). "An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." Id. § 1225(a)(4). An alien granted leave to withdraw his or her application for admission may exit the United States voluntarily and without a removal order. See 8 C.F.R. § 1235.4.

had a fear of returning to Brazil in 2003, he would have stated that he was afraid to return because he is afraid that his uncle was going to come after him and harm him. Ferreira claimed that his uncle is a dangerous person and that he was told that his uncle had killed Ferreira's father when Ferreira was one year old, and had killed other people, but was never been punished for his crimes. Ferreira does not know why his uncle killed his father. He asserted that his grandmother was afraid for Ferreira's well-being the one time that they encountered his uncle and he believes that he was his uncle's target because he was the "man of the house." Ferreira admitted, however, that he has never spoken with his uncle.

Ferreira does not remember many of the details of his interactions with immigration officials in 2003, including: whether he spoke to more than one immigration officer; whether he was questioned in Portuguese; whether a Portuguese interpreter was on the telephone and was used to translate the interview; whether any immigration officers spoke to him in Spanish; whether he was read his rights in Portuguese; or whether an immigration officer asked if he would like to withdraw his application for admission to the United States. Although Ferreira's testimony concerning the immigration proceedings was unhelpful because of his poor recollection, the court finds Ferreira to be generally credible and concludes that he sincerely believes that he would have expressed this fear of his uncle if the immigration officer had asked him in 2003 about fears of returning to Brazil.[4]

---

[4] The government seeks to discredit this testimony based on statements in an application for asylum and withholding of removal (Form I-589) filed in Ferreira's name in June 2004, which include no mention of the murder of his father or fear of his uncle, but instead states that "the people against gays from my town tried to kill me because they don't accept gay people," that "I fear for my life" and so on. Gov't's Opp'n 2 [#52]; Hr'g Ex. 11 (Application for Asylum and for Withholding of Removal). The statements in the 2004 application, however, cannot be attributed to Ferreira.

The portion of the form referencing the threat to gays is written in different handwriting than the portions listing Ferreira's name and other basic information. Hr'g Ex. 11 3-4. And although the

b.  The Expedited Removal Process in General Terms

Lisa Martin began serving as an officer for Customs and Border Protection in 2001.[5] Agent Martin testified that when someone is stopped at a United States border station for attempting to enter without authorization, the person is questioned briefly about basic information, including his or her name and the country from which he or she departed. The person is then held in a holding cell pending a further interview, which normally occurs on the same or following day.

In December of 2003, Agent Martin was stationed at the San Ysidro, California, port of entry, and conducted these secondary interviews. The interviewees were brought from their holding cell to an immigration officer's desk for these interviews. If the interviewee did not speak English, Agent Martin utilized the telephonic interpreter service.

David Sargent, an employee of Cyracom International, testified that he provides Portuguese interpreter services over the telephone, including for immigration officials at the San Ysidro, California, port of entry.

---

application is signed by the Defendant, it also acknowledges that Ferreira speaks Portuguese and is not fluent in English, and that another person assisted him in filling out the form. Id. 5.

The Declaration for the person who prepared the form is signed by a "Samantha Rodrigues" of 1700 N. 10th St. in McAllen, Texas. Id. Records from a 2013 Texas judicial proceeding show that a business operating from the same address, Immigration Help, provided immigration services or legal document preparation services; that its owner, Marilia Luz, falsely operated under the name "Samantha"; that there was a judicial finding that Luz violated her oath as a notary public; and, that the State of Texas has permanently enjoined her further immigration representation activities. See Hr'g Ex. 10 (Agreed Final J. and Permanent Inj., No. C-2947-13A (Hidalgo Cty. Dist. Ct. May 22, 2013)); Hr'g Ex. 13(Examination Under Oath of Marilia Luz, March 12, 2013). On this record, the court concludes that the statements in the 2004 application lack any indicia of reliability.

[5] Lisa Martin is currently a special agent with the Department of Homeland Security Investigations, and is referred to herein as "Agent Martin."

Form I-867A, entitled "Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act," sets forth more than half a page of instructions and warnings, including one paragraph on protection for persons who face persecution.[6] Hr'g Ex. 1. Mr. Sargant explained that prior to the events at issue, he had received a blank copy of Form I-867A, and had translated these instructions and warnings into Portuguese for ease of later interpreting. In Mr. Sargant's experience, not every immigration officer reads the Form I-867A opening statement in

---

[6] These paragraphs read as follows:

> I am an officer of the United States Immigration and Naturalization Service. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your sworn statement, I also want to explain your rights, and the purpose and consequences of this interview.
>
> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of five years or longer.
>
> This may be your only opportunity to present information to me and the Immigration and Naturalization Service to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.
>
> Except as I will explain to you, you are not entitled to a hearing or review.
>
>> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.
>
> Until a decision is reached in your case, you will remain in the custody of the Immigration and Naturalization Service.
>
> Any statement you make may be used against you in this or any subsequent administrative proceeding.

its entirety to the interviewee, and occasionally immigration officers omit parts of the statement. Mr. Sargent's practice is to interpret exactly what the immigration officers say, even if it does not track the language on Form I-867A.

In response to the government's question as to whether she "always read the entirety of that statement" on the Form I-867A, Agent Martin testified, "I believe so, yes." Agent Martin stated that when she used a translator, she read a line or two of text, let the interpreter translate what she just said, and then continued with the next few lines.

Agent Martin testified that she asked the interviewee questions, in English, which she documented onto Form I-867. After she asked each question in English, she allowed the interpreter to translate the question to the interviewee and then translate the interviewee's response back to Agent Martin. She then typed the answer given to her by the translator into the form verbatim.

Form I-867B, entitled "Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act," sets forth four questions that relate to the interviewee's possible fear of returning to their home country. Agent Martin explained that if the interviewee expressed fear of being returned to his or her home country or being removed from the United States, that person was kept in custody and referred to the asylum officer in Los Angeles for an asylum interview.

Directly below the four questions on Form I-867B is the Jurat, which states:

> I have read (or have had read to me) this statement, consisting of __ pages (including this page). I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above named officer of the Immigration and Naturalization Service. I have initialed each page of this statement (and the corrections noted on page(s) ____.

Id. Below this Jurat there is a signature line, and spaces for the agent and a witness to sign.

Mr. Sargent has not been provided a copy of a blank Form I-867B, and has not been asked to interpret the words of the Jurat. He also has never been asked to translate back to Portuguese the interviewee's answers as recorded by the immigration officer on Form I-867. Agent Martin similarly testified that she did not read back the answers she had written on Form I-867 for the interpreter to translate for the person being asked to sign the Jurat.

Agent Martin stated that after she asked questions and received responses, she used the interpreter to help explain to the interviewee the part of the Form I-296, entitled "Notice to Alien Ordered Removed/Departure Verification," Hr'g Ex. 4, pertaining to the length of time that alien would be inadmissible to the United States. She documented the alien's response on Form I-867. Agent Martin next asked the interpreter to advise the alien that what is written on the form documented the questions and answers from the interview.

Once the interpreter finished explaining this, Agent Martin disconnected the call with the interpreter. She signed the I-867B form, had the interviewee sign it, and had a second immigration officer sign it. She also testified that, because she was fluent in Spanish, she tried to instruct Spanish and Portuguese speaking immigrants to do physical tasks, such as fingerprinting and moving around the office, using Spanish and her body language.

Agent Martin stated that after each interviewee left her desk, she filled out the I-213 Form, entitled "Record of Deportable/Inadmissible Alien." Hr'g Ex. 5.

Prior to being removed from the United States, but after the detained immigrant left the immigration officer's desk, the immigrant was given the I-296 Form, see Hr'g Ex. 4, and an I-860 Form, entitled "Determination of Inadmissibility," Hr'g Ex. 2, 3. These two forms were not read to the person in his or her native language.

Agent Martin had the discretion to allow an individual detained at the border to withdraw

their application for admission and be voluntarily removed without a bar to reentry, but could only exercise this discretion at the San Ysidro port of entry if the alien was a legal resident or citizen of Mexico. Otherwise, the immigration officials could not allow the individual to withdraw the application for admission and instead had to remove the alien to their home country.

        c.        <u>Ferreira's Expedited Removal Process</u>

As noted above, Ferreira had little recollection of his removal process. Agent Martin had no independent recollection of interviewing Ferreira in 2003, but acknowledged that she interviewed him after recognizing her name and signature on Ferreira's Form I-867. Hr'g Ex. 1.

Ferreira's Form I-867A states that the statement was taken in Portuguese, and lists an interpreter's identification number and employer. Mr. Sargant has no independent memory of providing interpreter services on December 3, 2003, and could not remember whether he provided services for the agent who conducted the interview in this case. However, Mr. Sargent verified that the identification number and employer on Ferreira's I-867A form were his interpreter identification number and employer. Agent Martin testified that the form would not have included a Portuguese interpreter's identification number unless the statement had been taken in Portuguese. Based on this testimony and documentation, the court concludes that at least the portion of Ferreira's interview reflected on the I-867A form was conducted in Portuguese.

Ferreira's Form I-867B reports the answers to the four questions as follows:

Q: Why did you leave your home country or country of last residence?
A: I came to work and help my family.

Q: Do you have any fear or concern about being returned to your home country or being removed from the United States?
A: No.

> Q: Would you be harmed if you are returned to your home country or country of last residence?
> A: No.
>
> Q: Do you have any question or is there anything else you would like to add?
> A: How long is this going to take? I want to spend Christmas at home.

Id. The Jurat below these four questions is filled in by hand, and states in the first sentence that "I have read (or have had read to me) this statement, consisting of __1__ pages (including this page)." Following the Jurat is Ferreira's signature, followed by "Sworn and subscribed before me at the SAN YSIDRO, CA, POE on December 3, 2003[,]" and the signatures of Agent Martin and "G. Rios, CBP Officer." Id. According to the typed answers to the questions on Form I-867B, Ferreira told Agent Martin that he did not have a fear of returning home. See id.

A number of factors suggest, however, that these answers may not have been Ferreira's responses to questions asked while the interpreter was still on the telephone. First, the record is undisputed that no answers were read back to interviewees before they signed the jurat. And Agent Martin explained that it was her practice to have the interpreter tell the interviewees that she had recorded the interviewees' responses without reading back to them what she had written, despite the Jurat stating that the statement was read back to them. She would then obtain their signatures under the Jurat. For this reason, the Jurat is meaningless.

Second, although Agent Martin acknowledged that Forms I-867A and I-867B were parts of a single form reflecting a single set of questions and answers, she did not paginate the three pages of Ferreira's form in this manner, but rather as two separate documents. On Ferreira's Form I-867A (which includes the identification of the Portuguese interpreter), the blank space at the bottom of the page is filled in to read "Page 1 of _2_." Hr'g Ex. 1 at 1. Form I-867A is followed by Form I-831, entitled "Continuation Page for Form I-867A." Id. at 2. Typed at the bottom of the Form I-831 continuation page is "2 of 2 Pages." Id. On Ferreira's Form I-867B

9

(which does not include information about an interpreter), the blanks at the bottom of the page are filled out by hand to read "Page 1 of 1," and, as noted above, the completed jurat states in the first sentence that "I have read (or have had read to me) this statement, consisting of 1 pages (including this page)." Id. at 3.

Third, Agent Martin's description of her interview process further suggests that she addressed the I-867B questions separately. She testified that after going through all of the questions, telling the interviewee that he or she would be asked to sign the documents reflecting their statements, and giving the interviewee the information from the Form I-296 relating to the length of time that they would be removed "at the end of the interview," she would memorialize the interviewee's response to the question, "Do you understand that you are going to be removed from the United States for five years?" on the form, and then let the interpreter go. But that final question appears as the last question on the continuation page to Ferreira's Form I-867A (Form I-831, labeled 2 of 2 pages), id. at 2, and before any of the questions on the form I-867B, see id. at 3.

Fourth, Agent Martin's admitted errors on another form suggests that she was using a template or copied forms to assist her processing of Ferreira's interview. Ferreira's Form I-213, labeled "Record of Deportable/Inadmissible Alien," reports that "during an oral interview and written sworn statement conducted . . . in the *Spanish* language . . . Ferreira freely and voluntarily . . ." made the statements set forth on the form, including that he had no fear of returning to Brazil. Hr'g Ex. 5 (Ferreira's Form I-213) (emphasis added). When asked about the reference to the Spanish language on Ferreira's Form I-213, Agent Martin explained that she must have overlooked changes to Ferreira's Form I-213 narrative when she was working off of a prior interviewee's Form I-213 narrative that she had pasted into Ferreira's form. Agent Martin

10

pointed to other editing errors on Ferreira's Form I-213 narrative that she overlooked, including that she wrote that "FERREIRA stated that *she* left Brazil in November of *1999.* FERREIRA stated that *he* left Brazil on November 21, *2003*" Id. at 2 [#34-1] (emphasis added).

Defendant's Form I-860, entitled "Notice and Order of Expedited Removal," begins with a "Determination of Inadmissibility" stating that the Immigration and Naturalization service has determined that Ferreira is inadmissible to the United States because he is a citizen and national of Brazil, and has no legal right to enter the United States, and is not in possession of a valid visa. Hr'g Ex. 2, 3. It continues with an "Order of Removal," ordering his removal from the United States, and a certificate of service of the document on Defendant. Id. at 1-2. Defendant's Form I-296, "Notice to Alien Ordered Removed / Departure Verification," states that Defendant has been found to be inadmissible and is prohibited from entering the United States for a period of 5 years from the date of departure. Hr'g Ex. 4. The last paragraph of the document states the disposition, namely that Ferreira is inadmissible to the United States under section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, that he was served an I-860, expeditiously removed for 5 years and taken into custody awaiting travel to his home country." Id. at 2.

Agent Martin, as well as Supervisory Immigration Inspector Susan Boutwell and Assistant Area Port Director David Salazar, signed Ferreira's Form I-860. Hr'g Ex. 2,3 at 1. On the second page of Form I-860 is a certification that Agent Martin "personally served the original of this notice upon [Ferreira] on 12/3/03," followed by Agent Martin's signature. Id. at 2. Agent Martin testified that allegations on the Form I-860 were not read to or translated for the people being removed, and she acknowledged that, despite her certification of service on Ferreira's

11

Form I-860, id., she was not the officer who would have given Ferreira the form. Ferreira's signature does not appear on his Form I-860. Id.

    B.  Legal Standard

Ferreira bring this challenge to his 2003 deportation order under 8 U.S.C. § 1326(d), which codified the Supreme Court's decision in United States v. Mendoza-Lopez, 481 U.S. 828 (1987). There, the Court held that

> [W]here a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding . . . . This principle means at the very least that where the defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense. [] The result of those proceedings may subsequently be used to convert the misdemeanor of unlawful entry into the felony of unlawful entry after a deportation. Depriving an alien of the right to have the disposition in a deportation hearing reviewed in a judicial forum requires, at a minimum, that review be made available in any subsequent proceeding in which the result of the deportation proceeding is used to establish an element of a criminal offense.

Id. at 837-38, 841 (internal citations and footnotes omitted). Under Mendoza-Lopez, "a person who is prosecuted for illegal reentry based on a previous order of deportation must have meaningful review of the validity of his or her deportation order." United States v. Luna, 436 F.3d 312, 317 (1st Cir. 2006)

To successfully collaterally attack the 2003 deportation order, Ferreira must prove: (1) that he exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived him of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair. 8 U.S.C. § 1326(d); see also United States v. Luna, 436 F.3d at 317. "The elements of section 1326(d) are conjunctive, and [a defendant] must satisfy all of those elements in order to prevail on a collateral challenge of his removal order." United States v. Soto-Mateo, 799 F.3d 117, 120

(1st Cir. 2015).

C. <u>Analysis</u>

1. Exhaustion of Administrative Remedies and Deprivation of Opportunity for Judicial Review

Ferreira asserts that the expedited removal procedure delineated in 8 U.S.C. § 1225(b)(1) affords no opportunity for administrative or judicial review, and thus that there were neither administrative remedies for him to exhaust nor opportunity for judicial review. Def.'s Mot. to Dismiss 11-13 [#34]. The government, on the other hand, argues that Ferreira's available "remedy" was to express a reasonable fear of returning to Brazil, which would have opened the door to administrative and judicial review. Gov't's Opp'n at 5, 7 [#52]. In the government's view, by not expressing a credible fear, Ferreira has waived the only administrative remedy to which he is entitled. <u>Id.</u> at 6.

Under 8 U.S.C. § 1225(b)(1), when an immigration officer determines that an arriving alien is inadmissible, an order of deportation may issue under either of two different subparagraphs. First, under subparagraph (A)(i), the immigration officer "shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. §1225(b)(1)(A)(i). By its terms, no administrative review is available for an order issued under this subparagraph.

If the alien indicates either an intention to apply for asylum or a fear of persecution, the statute directs that the alien is referred for an interview by an asylum officer.[7] <u>Id.</u> § 1225(b)(1)(A)(ii). Under subparagraph (B)(iii)(I), if the asylum officer determines that an alien

---

[7] An "asylum officer" is an immigration officer who "has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of [asylum] applications" and is supervised by an officer with such training who "has had substantial experience adjudicating asylum applications." <u>Id.</u> § 1225(b)(1)(E).

13

"does not have a credible fear of persecution, the asylum officer shall order the alien removed from the United States" subject to review by an immigration judge under subparagraph (B)(iii)(III). By its terms, administrative review is available for an order issued under this subparagraph. Lest there be any doubt, 8 U.S.C. § 1225(b)(1)(C) provides further that "a removal order entered in accordance with subparagraph (A)(i) or (B)(iii)(I) is not subject to administrative appeal" "except as provided in subparagraph (B)(iii)(III)."

Here, Ferreira did not indicate an intention to apply for asylum, or a fear of persecution, and the order of deportation was issued by the immigration officer under subparagraph (A)(i), and not by an asylum officer pursuant to (B)(iii)(III). Accordingly, the order at issue here did not allow for any administrative appeal, and there was no order under subparagraph (B)(iii)(III) that would have allowed for an administrative appeal for Defendant to exhaust or for further judicial review. See United States v. Raya-Vaca, 771 F.3d 1195, 1202 (9th Cir. 2014) (finding that "the statute governing expedited removal proceedings afford[s] [an applicant for admission] no opportunity for administrative or judicial review" except as provided under 8 U.S.C. § 1225(b)(1)(B)(iii)(III)); United States v. Barajas-Alvarado, 655 F.3d 1077, 1082 (9th Cir. 2011) ("[T]he [Immigration and Nationality Act] precludes meaningful judicial review of the validity of the proceedings that result in an expedited removal order.").

Accordingly, the court turns to whether entry of the underlying order was fundamentally unfair.

    2. Fundamental Unfairness

Ferreira claims fundamental unfairness because he was not given the opportunity for either a credible fear interview or to withdraw his application for admission to the United States. To satisfy the fundamental unfairness prong, "courts uniformly require a showing of procedural

14

error and prejudice." Luna, 436 F.3d at 319. The court considers procedural error and prejudice separately as to each of Ferreira's claims.

      a. Credible Fear Interview

           i. Procedural Error

In United States v. Loaisiga, the First Circuit "assume[d] without deciding that it would be a fundamental flaw under Mendoza-Lopez to fail to advise one threatened with deportation of his statutory right to self-obtained counsel," noting that in immigration matters, "it has been left primarily to Congress and to INS regulations to dictate the course of proceedings." 104 F.3d 484, 486 (1st Cir. 1997). In Luna, the First Circuit similarly did not resolve the question of whether the agency's errors would, if prejudicial, render the deportation proceedings fundamentally unfair. See Luna, 436 F.3d at 321. Without further guidance from the First Circuit, the court proceeds first by determining whether the procedures here violated those mandated by Congress and INS regulations.

> The regulations require that:
>
> The examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A. Following question and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining officer shall record the alien's response to the questions contained on Form I–867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement. After obtaining supervisory concurrence in accordance with paragraph (b)(7) of this section, the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the reverse of the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

8 C.F.R. § 1235.3(b)(2)(i). In the case at hand, the court has concluded that Agent Martin used an interpreter for a portion of the necessary communications. But the record is also undisputed that the Jurat was not translated to Portuguese, and the answers were not read back to Ferreira

before he was asked to verify that his responses were taken down correctly. And in light of Agent Martin's separate treatment of Forms I-867A and I-867B, the court finds it likely that the questions on the I-867B form may not have been asked while the interpreter was still on the line. Finally, Agent Martin testified further that she did not relay to the people she interviewed the charges set forth on the Form I-860 (despite the requirement to do so in the regulation), and despite her written certificate of service of the Order of Removal. She conceded that she did not personally serve the document on Ferreira, whose signature does not appear on the back of the form, as also required by regulation. See Hr'g Ex. 2, 3. Therefore, there is no evidence that Ferreira was made aware of the information contained in these documents. Accordingly, Ferreira has shown that his expedited removal was procedurally flawed, and that any waiver of his opportunity for a credible fear interview was not knowingly and intelligently made.

      ii.   Prejudice

To show prejudice, the defendant must show "'a reasonable likelihood that the result would have been different if the error in the deportation proceeding had not occurred.'" Luna, 436 F.3d at 321 (quoting Loaisiga, 104 F.3d at 487). Thus, it is not enough for Ferreira to show he would have been given a reasonable fear interview had he understood the proceedings; he must show a reasonable likelihood that his asylum application would have been successful on the merits. See Boliero, 923 F. Supp. 2d at 332 (requiring the defendant "show . . . a reasonable likelihood that the hearing officer would have granted [the defendant's] section 212(c) application had [the hearing officer] reached the merits"). When analyzing prejudice, the court "must evaluate the . . . application in the same way the hearing officer would; it must conduct a 'trial within a trial.'" Id. (quoting Luna 436 F.3d at 321)); see also Loaisiga, 104 F.3d at 488 (finding that "based on Loaisiga's showing, [the court has] no reason to think that Loaisiga had

16

any realistic chance of success").

Ferreira asserts that had he understood the expedited removal proceedings, he would have informed the immigration officers that he feared returning to Brazil and "the deportation proceeding would have necessarily stopped and he would have been referred for an interview by an asylum officer." Def.'s Mot. at 17 [#34]. But, Ferreira must show not only that he would have been granted a credible fear interview, he must show a reasonable likelihood that his asylum application would have been granted. See, e.g., Boliero, 923 F. Supp. 2d at 332.

To qualify for asylum, Ferreira must demonstrate that he has "a genuine and objectively reasonable fear of suffering individualized persecution in the future" due to his membership in a particular social group. Sosa-Perez v. Sessions, 884 F.3d 74, 77 (1st Cir. 2018); 8 U.S.C. § 1101(a)(42). One's nuclear family may constitute a "social group" for purposes of an asylum application. Sosa-Perez, 884 F.3d at 77; see also Ruiz v. Mukasey, 526 F.3d 31, 38 (1st Cir. 2008) ("Kinship can be a sufficiently permanent and distinct characteristic to serve as the linchpin for a protected social group within the purview of the asylum laws."). Ferreira must also show that the harm is attributable to the action or inaction of the government of his home country, Brazil. See Morales-Morales v. Sessions, 857 F.3d 130, 135 (1st Cir. 2017).

At the evidentiary hearing, Ferreira testified that he was told his uncle had killed his father and other people. He stated that he knows that his uncle is dangerous because his grandmother was afraid for his well-being the only time that they encountered his uncle in Brazil. But, Ferreira did not provide evidence—direct or circumstantial—to show a nexus between his uncle's criminal activity and Ferreira's kinship. Ferreira has never spoken with his uncle himself, and presented no evidence that his uncle directly (or indirectly) threatened him or attempted to harm him at the time of the deportation order. See, e.g., Aguilar-De Guillen v.

17

Sessions, 902 F.3d 28, 34 (1st Cir. 2018) ("Petitioner introduced no direct (or circumstantial) evidence that the gang's threats had anything to do with her membership in her husband's family" rather than "to increase their wealth through extortion."); Sosa-Perez, 884 F.3d at 74 (petitioner offered no direct evidence that assailants attacked her on the basis of her kinship status, despite that multiple members of her family had been victims of attack).

Nor does Ferreira argue that the Brazilian government was supporting his uncle in 2003, or was unwilling, or unable, to protect Ferreira at that time. "Although a state may sanction persecution through inaction, the petitioner must demonstrate that 'the government . . . would have been unwilling or unable to pursue these lines of redress on [the petitioner's] behalf.'" Guaman-Loja v. Holder, 707 F.3d 119, 124 (1st Cir. 2013) (alterations in original) (quoting Castillo-Diaz v. Holder, 562 F.3d 23, 28 (1st Cir. 2009)). While Ferreira testified that his uncle has not been arrested or punished, he did not state whether he or his family members had informed law enforcement of his uncle's wrongdoings, unsuccessfully sought aid from the police, or that the Brazilian government supported his uncle. See, e.g., Galicia v. Ashcroft, 396 F.3d 446, 448 (1st Cir. 2005) ("Galicia did not show that the harassment he suffered was by the government or a group the government could not control." (citing Silva v. Ashcroft, 394 F.3d 1, 7 (1st Cir. 2005))). Accordingly, the court finds that Ferreira has not demonstrated that he was likely to have been successful as to a 2003 asylum application. [8]

  b.  Withdrawal of Application

Ferreira next argues fundamental unfairness because, had he known that he could ask to

---

[8] The court does not address the likelihood of success of Ferreira's current application for a credible fear interview, as the court (1) considered only the claim if it had been made in 2003, and not any further developments; and (2) as to 2003 claim, made only a preliminary determination of the likelihood he would have prevailed based on evidence presented at this hearing, and not a final determination.

withdraw his application for admission to the United States,[9] he would have done so and his request likely would have been granted. Def.'s Aff. ¶ 16 [#34-5]; Def.'s Mot at 17-18 [#34].

### i. Procedural Error

Ferreira points to no regulation instructing immigration officers that they must inform detained immigrants of the option to withdraw their applications for admission. The First Circuit has concluded that that there is no constitutional right to be informed of the opportunity for discretionary relief. Soto-Mateo, 799 F.3d at 123 ("[A] majority of circuits have rejected the proposition that there is a constitutional right to be informed of eligibility for—or to be considered for—discretionary relief. Today we join that majority." (internal quotation marks and citation removed)). The Ninth Circuit has similarly held that an "immigration officer's failure to inform [a non-admitted alien] of his ability to request withdrawal of his application for admission did not violate his due process rights." United States v. Sanchez-Aguilar, 719 F.3d 1108, 1112 (9th Cir. 2013). Ferreira cites no case showing otherwise.

Accordingly, Ferreira has failed to show a procedural error as to this claim.

### ii. Prejudice

Assuming *arguendo* that the failure to inform Ferreira that he could request to withdraw his application was erroneous, Ferreira cannot show a reasonable likelihood that his request would have been granted. Agent Martin testified that Customs and Border Protection officers only allowed applicants to withdraw their applications if they were a resident or citizen of the bordering country. Ferreira did not present any evidence to rebut this assertion. Therefore, based

---

[9] "The Attorney General may, in his or her discretion, permit any alien applicant for admission to withdraw his or her application for admission in lieu of . . . expedited removal[,] . . . but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission." 8 C.F.R. § 1235.4.

19

on the evidence presented, the immigration officials did not have the authority to allow Ferreira—a citizen and national of Brazil with no legal status to remain in Mexico—to withdraw his application and remain in Mexico. Cf. Raya-Vaca, 771 F.3d at 1206-10 (defendant, a citizen of Mexico, demonstrated unique circumstances warranting plausibility for relief); United States v. Bayardo-Garcia, 590 F. App'x 660, 662-63 (9th Cir. 2014) (specific facts of defendant's case would warrant an exercise of discretion). Ferreira states that he could have asked his cousins to help him purchase an airplane ticket back to Brazil, but "[p]ermission to withdraw an application for admission should not normally be granted unless the alien . . . is able to depart the United States *immediately*." 8 C.F.R. § 1235.4 (emphasis added).

D. Conclusion

Having failed to show that his 2003 deportation order was fundamentally unfair under section 1326(d)(3), Ferreira's Motion to Dismiss [#34] is DENIED.

IT IS SO ORDERED.

Dated: February 1, 2019                                    /s/ Indira Talwani
                                                           United States District Judge